### McINTYRE et al. v. PARKIN et al.

No. 2945.

Fourth Division.

Aug. 10, 1928.

Louis K. Pratt, of Fairbanks, for plaintiffs.

Morton E. Stevens, of Fairbanks, for defendant Sarah A. Fiske.

CLEGG, District Judge (orally).

The issues, therefore, as the court views them, are:

(1) Was the annual assessment work done on these mining claims as alleged in the amended answer by J. R. Parkin and denied in the reply?

(2) Was the notice of forfeiture published by Mrs. Parkin Fiske, as administratrix of the estate of J. R. Parkin, sufficient?

(3) What is the effect of this contract that is set up in the reply with reference to the rights of the plaintiffs as alleged in their complaint?

The facts disclosed by the evidence are all tendered by the defendant. There is no evidence whatever offered by the plaintiffs on these issues. The facts, as the court understands them, are not contested by the plaintiffs, but it is the conclusions that the court should draw from these facts which causes the difference between the contentions of the parties before the court.

The testimony and evidence before the court shows that Parkin came to Alaska under the terms of the contract set up in the reply, and that, in accordance with its terms, he immediately proceeded to acquire placer mining claims for the benefit of himself and the other parties to this agreement who were represented by P. J. McIntyre as agent. He prospected a number of claims in the Circle mining district and some in the Fairbanks mining district, and what became of those particular properties the evidence does not disclose. But the evidence does show that, from the year 1911, Parkin had acquired the claims in controversy, and

had reported to Mr. McIntyre, as agent for himself and others, that these properties were valuable, and that they were not of a rich mineral content such as would justify working by pick and shovel, but that, in his judgment, they were good mining properties for hydraulic mining.

Parkin appears from the testimony to have been occupied in mining in Colorado before he came to Alaska and that he was in Alaska prior to the time the contract mentioned was executed.

The claim of the plaintiffs is that Parkin did not do the requisite annual assessment work on these properties during the years mentioned, but on this issue they tender no proof whatever. No testimony that denies this was offered, and the only evidence on this subject, as had been stated before, is offered by the defendant. The claim of a party to any suit ought to have a basis in fact. There is no basis of fact for this contention on the part of the plaintiffs. They offer not a scintilla of evidence to support that contention. Their task is concerned in tearing down, minimizing, and criticizing the effect of the defendant's evidence on that point. It is inconceivable from the letters which are introduced in evidence here as part of the deposition of P. J. McIntyre, which was taken by stipulation of the parties, that Parkin could hold such a high opinion of the mineral value of these properties and that he would not do the assessment work. But we are not left entirely to rest on this conclusion from the tendered letters of Parkin. The defendants have introduced the direct testimony of eyewitnesses and persons who have seen the work done and have seen it after it was done. For instance, with reference to the year 1912, the testimony of the witness Ingram is uncontradicted that he made a survey of these particular properties at a cost of $500, and that, at the time he inspected the properties, reservoirs had been constructed and penstocks and a ditch conducting the water from Dry Gulch to the lower half of the Cheechaco Association. The letters of Parkin to Mr. McIntyre show

that he had initiated and was intending seriously to complete a system of carrying water on these properties for the benefit of all of them for the purpose of furnishing sufficient water for hydraulic mining, and that the ditch that was surveyed by Ingram was about two and a half miles at least in extent and was to tap Twelve Mile creek and bring the water along the left limit of Birch creek to the properties. The witness also mentioned a pressure box which Parkin had constructed at that time and, in the year 1913, as I understand the testimony, he was on the ground and saw that the penstock which he viewed in 1912 had been considerably enlarged, and other improvements in the way of buildings were constructed on the property, some for residence purposes. Later testimony shows additions were made to this residence that Parkin occupied.

There is no strong testimony offered by the defendants with reference to the years 1914, 1915, and 1916, as I recall, except the inference that the court is authorized to draw from the announced intentions in the letters of Parkin to Mr. McIntyre and the fact that, in addition to any money contributed by Mr. McIntyre as agent, Parkin was earning money in three different ways: First, as a game hunter for the market; second, as a wage-earner for a hydraulic mining property eight miles distant during certain months of the summer; and, third, later in 1916, I think, by conducting a roadhouse, and the business of this roadhouse some years later, about 1921, as shown by the letters of Parkin, increased to such an extent that he had on hand at one time at least $4,000 worth of provisions which he stated in his judgment would net him $10,000 when served as meals in the roadhouse. This indicates that Parkin was a man of unbounded energy and a man of unfailing optimism, and no one can read the letters which he wrote to Mr. McIntyre without being impressed with the fact that this hydraulic proposition on these particular claims was a pet hobby of his and that it was something that he could not be parted from, and the court must presume, where

the facts are such, that Parkin, as a part owner of these properties at that time and the only man on the ground who had an interest in the property, was obeying the law and not disobeying it by failing to do the assessment work. Even if there was no direct evidence, the internal evidence in these letters is clear and convincing that during that period from 1913 to 1916 the work was done on these properties. This is apparent also from the fact that the affidavits which he afterwards filed for assessment work showed that he was continuing to install and complete the installation of a complete hydraulic plant on these five properties, which were grouped in 1915 under the name of the Cheechaco group, in which notice of grouping he announced to the world that he was going to work all these five different properties as one unit for hydraulic mining purposes, and that all work thereafter to be done on any one 'of them was to be done for the benefit and development of all the properties. The court will certainly not substitute its judgment as to the character of the work done and its sufficiency as a benefit to the entire group of claims for the judgment of Mr. Parkin, who, so far as the parties to this case are concerned, was the only one on the property who knew anything about what he was doing.

With reference to the years 1921 to 1925, I think the affidavits of labor which are tendered and which are introduced in evidence by the defendants and not contradicted in any way show conclusively to the court that the assessment work was done during those years.

It is further contended by the plaintiffs that, even if the work was done by Parkin, which they deny, the proper proceedings were not carried on by Parkin with reference to forfeiting the interest of these co-owners, and special attack is made upon the contents of the published notice of forfeiture by Sarah A. Parkin, as administratrix of the estate of J. R. Parkin, deceased.

The court has examined this document very carefully, and it is subject to the criticisms raised by Judge Pratt,

in that it is addressed to persons who have no interest in some of the claims mentioned, but all of the parties plaintiff in this case are mentioned and all the claims are mentioned in the notice which these people had an interest in or which, undoubtedly, they had knowledge of. It is also subject to the criticism that specific mention is not made of the sums which they were called upon to contribute, but, without mentioning the sums, anybody with any knowledge whatever of arithmetic who is a co-owner of the property, can figure out in a moment's time what proportion of the assessment work for each of these properties named in the notice each is called upon to pay, and the notice is not defective for that reason. Nor is it defective for the reason that it is signed by Sarah A. Parkin as administratrix of the estate of J. R. Parkin, deceased. That seemed to the court all along to be the serious question in the case with reference to the notice, but the court has heretofore concluded, and adheres to that opinion, that the notice is sufficient.

For the reason heretofore mentioned and additional reasons, the first reason being that Sarah A. Parkin, who signed the notice as administratrix of the estate of J. R. Parkin, deceased, was the wife of J. R. Parkin and afterwards turned out to be the heir at law of J. R. Parkin, deceased, and entitled to the possession of the property. The names are identical, and the person is identical, and why should the court overthrow this notice of forfeiture because of the failure of the attorney, who was an attorney of repute, in having this notice signed by Sarah A. Parkin as administratrix of the estate of J. R. Parkin, deceased, instead of Sarah A. Parkin, individually. Where, for instance, are the plaintiffs damaged? Did not they have notice when it was signed by any one in any capacity by the name of Parkin that these are the claims they were interested in when it especially names J. R. Parkin and says he was a co-owner in this property and that it was his estate they are administering? They could not be misled. If they could be misled by the notice, the court would

be authorized to disregard it and hold that it is insufficient but there is no opportunity for the plaintiffs to be misled by the notice in that regard.

I intended to say a moment ago, when speaking of the contention of the plaintiffs, that the work was not done on this property: Does any sane man think that, if J. R. Parkin had not died before this suit was instituted the plaintiffs would contend that J. R. Parkin had not done the work on this property? The one conclusion the court can come to is that, because of the fact that not one of the letters, either introduced or referred to on the part of Mr. McIntyre, ever said a word about assessment work or about his failure to do assessment work, it gives the court the confident conclusion from the evidence that the question never would have been raised if Parkin had been alive at the trial of this action, but it is because of the insufficiency of the proof that the plaintiffs knew the defendant would be probably compelled to resort to, to prove that contention because of the absence of J. R. Parkin, that they insist upon it with so much stress. Nothing appears in the evidence that anybody ever communicated to Mr. McIntyre or any of the plaintiffs in this action that the assessment work was not done. They never were in the territory of Alaska and never left the city of Denver so far as the evidence is concerned, and did not have any knowledge that the work was not done on these properties during any of these years.

Now I think I have covered that sufficiently, and I will just add now that it is easy to conceive that the administratrix or an administrator of a decedent's estate would have the right to publish a forfeiture notice in the event that the estate being administered has insufficient property to pay the debts of the deceased, and it appears from the pleadings in this case and the testimony that the probate court administering this estate ordered the administratrix to publish a forfeiture notice against these plaintiffs and acquire that property for the benefit of the estate by that procedure, and certainly this court is war-

ranted in assuming that the probate court did not take that action just as a mere idle act, but that it must have had some basis of fact for taking such action, and, even though it is void as a matter of law, is the administratrix to be censured because she obeyed the orders of the probate court that appointed her in publishing the notice?·

■ Now it was contended for a while during the case, and I think the court is warranted in saying that that contention is abandoned, that this contract which has been introduced in evidence and which is set up in the reply executed by the plaintiffs and J. R. Parkin had something to do with the assessment work upon any properties Parkin might acquire under the contract. There is not a word which any reasonable person could justly say occurs in this contract with reference to assessment work. It says he is to "mine" or "work" the properties he acquires in Alaska. Those words are words used in ordinary leases that the lessee is to mine and work the property, and it certainly in no sense contemplates that any obligation in this contract rested upon Parkin to perform assessment work on the entire property for the benefit of the co-owners without compensation or contribution. There is not a word in there to justify such a conclusion, but, on the other hand, the law is settled and fixed that co-owners in unpatented placer mining property must contribute to the extent of $100 for the work that the law requires to be done as annual assessment work. That is something the law has established, and it is as certain as death and taxes that nobody can be a co-owner in unpatented placer mining property and keep and retain their ownership in it without contributing to the assessment work.

Now it is said here that these letters indicate something against the contention of the defendant with reference to this work, but I have inspected these letters and have read them very carefully, and there is no conclusion that can be drawn from these letters of Parkin from which it can be said that Parkin at any time intended to do this assess-

ment work for the benefit of the plaintiffs or for the benefit of his co-owners without a contribution. It is true the letters do not say anything about it, but you will find passages in quite a few of these letters which indicate the contrary. For instance, while Mr. McIntyre was contributing certain amounts of money, or some money when Parkin would suggest the need of it to continue installing the hydraulic mining machinery, and so forth, on this property, Parkin said nothing whatever about assessment work, but the minute they ceased to contribute anything, as they did in 1913, the situation is entirely different. Parkin, so far as the testimony shows, was the only person that refers to his backers as the Alaska Prospecting Syndicate. He calls them in his letters the "A. P. S.," but after 1913 I think you will find nothing about the A. P. S. His reference is to individuals. He refers to these people who put up the money as the "faithful ones." That merely indicates the faithfulness of Parkin. He still regards these people highly and was friendly to them, but he says in his letter, for instance, to Miss Sharp, "The sooner you get the money back, the better I will be pleased." While he is not talking anything about her interest in the property, it is merely his statement that, if he ever receives any money out of this property, he will see they will get their proportionate share back. Why would he mention money if he still thought they had an interest in the property? That letter was dated January 21, 1916, answering the letter of October 28, 1915. Then in October, 1917, to Mr. McIntyre he says, "I will give you a share of the money"—if he ever gets any money out of this property. Why would he say he would give him a share of the money? He merely intended that he will give these people their money or any portion of it provided he ever realizes anything out of this property, but he has ceased to regard them as co-owners in this property. Then in July 10, 1919, to Mr. McIntyre he said, "It is too bad you had to quit at the time you did." What conclusion can you drawn from that statement? "It is too bad you had to quit at the time you did." Did not

that refer.to the letter of McIntyre to Parkin in 1913 in which he said that the others were broke, but that he himself expected to make some money, and, if he did make some money, he would send Parkin some more, and he never sent any? Apparently he never made any more money and he never sent any.

Mr. Pratt: He is referring to Mr. McIntyre's losses in some corporation.

The Court: No, no, he is not. You can read that letter and see what the context is, because I remember it distinctly.

Now these plaintiffs are in the very same position many people find themselves in.

I will say this, in conclusion, at the time Parkin came to this country, this country was booming. It was in its heyday of prosperity, and the roseate pictures that Mr. Parkin drew to these people of the interior of Alaska as he knew it from a previous visit persuaded them that it was a matter of getting some money quick, and that, if he had $1,500, he could go right up here and do as others had done before, locate immediately a valuable placer mining claim or quartz mining claim or something of that character that would produce quick money, but, after some years of continuous effort on his part, he was unable to locate anything of that character, and, in order to protect their original investment, these plaintiffs kept on sending him money expecting him to get this particular property into working condition where, as he said, it would produce dividends, and it was prolonged or dragged on from year to year, and they got disgusted and dissatisfied and determined to put up no more, and, when they did that, they were through with the property, because J. R. Parkin kept up the annual assessment work and held on to it year after year out of his own money and with his own labor and the labor of others whom he paid. And under those circumstances it is regrettable that, when the property turned out to be as Parkin had prophesied to them, and truthfully, a

hydraulic property of considerable value, of course they thought they ought to have some interest in it, and I am satisfied that, if Parkin were alive and the property were sold even now, he would give back to these very people every dollar he ever got from them with interest, because every record here shows that J. R. Parkin was an honorable man and these plaintiffs considered him so. So I regret that they did not continue to keep interested in the property and do their share of the assessment work instead of forfeiting their interest in it, and the court does now find that they forfeited their interest in the property in favor of the defendants.